ANGEL BELTRÁN VEGA, demandante y apelado, *v.* LAUREANA ALMODÓVAR, demandada y apelante.

Núm. 8299.—*Sometido:* Mayo 27, 1941. *Resuelto:* Julio 15, 1941.

M. *Bahamonde Ricomar,* abogado de la apelante; *Ramón A. Gadea Picó,* abogado del apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO emitió la opinión del tribunal.

Este es un caso sobre reclamación de alimentos del marido a la mujer fallado a favor del reclamante.

En la demanda se alegó que demandante y demandada se casaron en Ponce hacía alrededor de cuarenta y tres años, viviendo en el mismo hogar hasta que el demandante, que sufría de parálisis del lado derecho, lo abandonó por haber sido agredido por su esposa con un tubo de hierro.

Que debido a su edad—sesenta y cuatro años—y a su estado físico, el demandante no puede trabajar y vive de la caridad de sus amistades; que antes desempeñó el empleo de *janitor* de las oficinas de la PRRA, con sueldo de sesenta dólares mensuales, empleo que cuando enfermó pasó a la demandada, con el entedido de que ésta pudiera continuar sosteniendo el hogar, y que la demandada no lo atiende ni protege.

Que durante el matrimonio se adquirieron dos casas, una que vive la demandada y otra que produce cinco pesos mensuales que cobra la demandada, y que el demandante de su manutención adeuda treinta y nueve dólares.

Contestó la demandada aceptando que está casada con el demandante. Alega que vivieron juntos hasta que el demandante la abandonó para irse a vivir con una querida llamada Rafaela Rodríguez, y que el esposo hacía unos diez meses se parapetó en la casa y con una estaca quiso evitar que la demandada entrara, tirándole con ella, teniendo la demandada que defenderse, por cuyo hecho la denunció y la hizo arrestar, siendo absuelta por la corte.

La demandada admite que el demandante sufre de parálisis del lado derecho pero alega que es zurdo y fué con el brazo izquierdo que intentó pegarle, y alega además que el demandante no vive de la caridad pública sino de la de su querida y que no es cierto que abandonara su colocación por razón de enfermedad y que se diera dicha colocación a la esposa para que lo sostuviera. Que la demandada trabaja en la oficina de la PRRA con otras personas y le pagan por horas y con lo que gana tienen que mantenerse ella y una hija de crianza.

Y alega por último que el marido vendió por sesenta pesos su participación en las dos casas que poseían, sin que existan otros bienes de la sociedad de gananciales y que no le consta que sea cierta la deuda que alega haber contraído el demandante.

Practicada la prueba, analizándola la corte sentenciadora se expresó como sigue:

"Es de notarse que la demandada declaró que ella lo que hizo fué defenderse cuando el demandante le tiró con un palo, y que fué con el brazo izquierdo con el cual el demandante intentó propinarle una paliza.

"La demandada, por lo tanto, no negó que le pegara al demandante. Pretende excusarse manifestando que no hizo sino defenderse cuando el demandante se parapetó en su hogar. Quien se parapeta lo hace para escudarse de un ataque. La inhabilidad e indefensión de un paralítico hacen forzoso buscar tal defensa.

"No es verosímil que un hombre paralítico del lado derecho del cuerpo, débil, anciano, y bajo tratamiento médico, provoque una lucha con una mujer más joven que él, y que está desempeñando un puesto que antes servía su esposo, sabiendo él que si ella contestaba cualquier amenaza o agresión,. o intento de ella, él se iba a encontrar completamente indefenso.

"La demandada alega que el demandante abandonó el hogar para irse a vivir con una concubina.

"El demandante, por el contrario, declaró que salió de su hogar y fué a vivir con un hermano de él; que un día se encontró con una antigua amiga, que le tiene agradecimiento por los favores que le hizo en años anteriores, y al verlo en el estado de enfermedad y pobreza,. lo invitó à ir a vivir a su casa, donde está y ella le presta la poca ayuda que puede.

"Sobre este extremo tan importante, el testimonio de la demandada no fué corroborado por ningún testigo. Si consideramos la edad avanzada del demandante y su estado físico ruinoso, no podemos comprender el estado de concubinato del demandante con una mujer descrita por la demandada como joven.

"Por su manera de declarar y su actitud en la silla testifical, la corte no puede dar crédito al testimonio de la demandada.

"La demandada declaró en la silla testifical que si el demandante retorna al hogar conyugal ella le suministrará todas sus necesidades conforme a su situación económica y social.

"La corte entiende que el demandante actuó legal y legítimamente al dejar el hogar conyugal, ya que la ley no sólo justifica la separación, sino que además establece como causa de divorcio la crueldad y las injurias graves.

"Al acogerse el demandante a la amistad de la amiga en cuya casa vive, sin que podamos presumir, a falta de prueba, la inmora-

lidad o el delito que la demandada pretende ha cometido el deman-- dante, entendemos que el demandante no hizo más que defenderse contra el hambre, la falta de abrigo y el desamparo en que se hallaba.''

Y seguidamente concluyó:

''Habiendo el demandante tenido que abandonar su hogar por el castigo físico a que lo sometió su esposa, somos de opinión que el demandante tiene derecho a rehusar ser recibido en la casa de su esposa para ser alimentado por ésta, a tenor de lo resuelto por nuestra Hon. Superioridad en *Moll* v. *Llompart,* 17 D.P.R. 694 y *Maeso* v. *Ortiz,* 44 D.P.R. 162.

''La corte, por la apreciación que ha hecho de toda la prueba ofrecida, declara con lugar la demanda en este caso, y, en su consecuencia, condena a la demandada Laureana Almodóvar, a pasar al demandante Angel Beltrán Vega, una pensión alimenticia mensual de $20, retrotrayendo la obligación del pago de la misma al día 18 de abril de 1940, fecha en que se radicó la demanda en el caso de epígrafe, de acuerdo con lo que dispone el art. 147 del Código Civil, ed. 1930, debiendo la demandada abonar la referida pensión al demandante por meses anticipados; apercibiéndosele de desacato si no cumpliere con la sentencia que se dicte en este caso, con imposición de las costas, sin que éstas incluyan honorarios de abogado.''

Como base del recurso que establece contra la sentencia, la demandada señala cuatro errores, a saber:

''1.—...gráve error de derecho al no estimar que el hecho probado de vivir el demandante con Rafaela Rodríguez, su concubina durante gran número de años, releva a la demandada de la obligación de mantenerlo mientras dure esa situación en que se ha colocado el demandante apelado.

''2.—...manifiesto error en la apreciación de la prueba, actuando con pasión y prejuicio.

''3.—...manifiesto error al obligar a la demandada que de $24 quincenales que gana ella para sí y otros más que la ayudan, le pase $20 mensuales al demandante y apelado, siendo excesiva dicha pensión concedida.

''4.—...erró al declarar sin lugar...la reconsideración de la sentencia.''

Comenzaremos nuestro estudio por el segundo de los señalamientos de error.

Difícil es en verdad para una corte de apelación después que la corte sentenciadora ha dicho que no le merece crédito un testigo, resolver lo contrario, ya que no hay duda de que la corte que ve y oye al testigo declarar está en mejores condiciones para apreciar la veracidad del testimonio que la corte que lee simplemente su declaración.

Sin embargo, el estudio que hemos hecho de los autos ha impresionado de tal modo nuestro ánimo, que no podemos dejar de expresar por lo menos las serias dudas que tenemos acerca de si estuvo o no acertada la corte sentenciadora al concluir que no era merecedora de crédito la declaración de la demandada.

Casi todo cuanto expresó quedó corroborado. Por ejemplo, dijo que su esposo vivía con una concubina y el propio esposo lo admitió en el juicio. Afirmó que ganaba veinte y cinco centavos por hora de trabajo, a veces veinte dólares quincenales, otras veinte y dos y otras diez y nueve cincuenta, y su afirmación está sostenida por evidencia documental. Manifestó que aun de esa suma tenía que descontar lo que daba a los que la ayudaban y su manifestación quedó comprobada por el resto de la prueba. Es cierto que narró eludiendo toda responsabilidad el hecho de la agresión a su marido y que hay por lo menos un testigo que afirma que la vió pegándole con un alambre, pero es lo cierto también que fué absuelta cuando se le llevó a la corte municipal y que ella sostiene que si pegó lo hizo en su defensa.

Por el contrario la declaración del marido llama la atención por lo exagerada al describir su situación y las diferentes agresiones de que fué víctima, pintándose él en todas ellas sin falta alguna, y las afirmaciones sobre el montante del sueldo de su mujer, sobre el instrumento con que fué agredido por ella y sobre las casitas poseídas por el matrimonio que su demanda jurada contiene, quedaron destruídas por la prueba.

Examinemos ahora conjuntamente los señalamientos de error primero y tercero y con ello terminaremos nuestro estudio porque en el cuarto se tratan las mismas cuestiones que en los tres primeros.

Una parte de la declaración de la demandada en el juicio que pone de relieve lo que hay en el fondo del caso y que revela claramente su actitud, es la que sigue:

"¿Él vive actualmente en la casa?—Vive en la casa de la querida, que hace veinte años que viven. Por eso es que estamos distantes, por esa mujer, por esa Rafaela Rodríguez es la mala vida que me ha dado, y no voy a trabajar para darle dinero a él para mantener a esa mujer. No tengo hijos, y yo supongo que en las cortes la que reclama el alimento es la mujer al hombre y no el hombre a la mujer. Yo le daría después que estuviera solo.

"Lic. Bahamonde: ¿Usted no tiene inconveniente en ayudarlo a él?—Estando solo sí, pero darle a ella no. ¿Que yo le dé a él, para que le dé los alimentos a esa mujer?

"¿Usted no está dispuesta a trabajar para darle a la querida?—Mejor dejo la colocación. ¡Levantarme a las cuatro de la mañana con esa nena que es mi sobrina, y ellos durmiendo a pata suelta y yo trabajando! ¡No me juegue! ¡El juez es cuchillo y yo soy carne!

"Juez: No haga comentarios. Aquí no hay ningún juez que sea cuchillo. Aquí se hace justicia para todos.—Testigo: Yo soy viejita ya....—Juez: Las cosas aquí son muy serias, y la corte sabe lo que quiere decir.—Testigo: Soy vieja ya...Juez: La corte no permite más aclaraciones. El castellano es muy claro.—Testigo: Quiero decir...Juez: Terminado. No podemos hablar más sobre eso. Testigo, siga declarando.

"Lic. Bahamonde: Que le dé una satisfacción.—Testigo: No puede ser que se le castigue a uno...—Lic. Bahamonde: No hable más, por Dios Santo. ¿Usted no tiene inconveniente en mantenerlo?—Testigo: Si estuviera solo sí, pero con esa mujer no. Es más, yo compraba, y cuando estaba en casa, le daba después de la compra cinco pesos.

"¿Él se fué de su casa?—Sí, señor.

"¿Dónde vive? ¿Dónde vive actualmente?—En el callejón San Juan.

"¿Con quién?—Con esa Rafaela.

"¿Esa Rafaela es algo de él?—Querida.

"Nada más.

"Lic. Gadea: Dígame señora, ¿usted dice que hace veinte años que esa señora es querida de su esposo?—Lo digo, porque soy su esposa y sé el tiempo."

Y partes, también características, de la declaración del demandante, son:

"¿Después que salió de Tricoche, qué sucedió entre usted y su señora?—Cuando llegué una tarde. Una tarde llegué allá como a las cinco y media. Llegué a casa y me dió cuatro gaznatadas en la cara, temblusco como yo estaba, y me tiró rodando por el suelo. Yo me cogí el pelo con las manos y me puse a llorar, y me tiré poco a poco y me fuí frente a la Milagrosa, a casa de Juan mi hermano, donde llegué como a las ocho de la noche. Como no podía ni andar.

"¿Después de eso, qué más pasó?—Después llegué y cogí y me tiré, al mucho tiempo, a los tres meses, en el mes de junio, un día que me vi descalzo, enseñando los pies, y me fuí donde ella.

"¿Usted había dejado su casa?—Sí, señor.

"¿Y dónde vivía?—En casa de Juan mi hermano.

.   .   .   .   .   .   .

"¿A qué se dedica usted?—Me dedico a pedir por el pueblo de mis amigos. A lo escondido, porque tengo miedo que de momento me cojan y me metan en la cárcel.

"¿Vive de la caridad de sus amigos?—Sí, señor. Me dan pesetas y diez centavos. Hay días que no encuentro nada y me cuesta acostarme así.

.   .   .   .   .   .   .

"¿Usted ha ido donde ella a pedirle que le dé?—Sí, me dió una zumba, y después que me dió, lo que voy a buscar es la muerte.

.   .   .   .   .   .   .

"Lic. Bahamonde: Dígame, Beltrán, ¿usted no puede trabajar de 'watchman'?—Testigo: Puedo trabajar de 'watchman' pero no me cogen en ninguna parte.

"Juez: La corte hace constar que al subir el testigo la silla de testigos, le fué casi imposible subir por su estado de parálisis que tiene. Eso es a los efectos del récord.

.   .   .   .   .   .   .

"¿Dice usted que sin que mediaran provocaciones ella le dió con un pedazo de tubo de hierro?—La pusieron presa por eso.

"Juez: ¿Ella lo golpeó a usted con un tubo de hierro?—No, con un foete de alambre liado, de esos cordones eléctricos. Tres alambres juntos.

"¿Entonces no fué con un tubo de hierro?—No fué un tubo de hierro, fué con un alambre eléctrico, de esos cordones.

"Lic. Bahamonde: ¿Cuando eso ocurrió, usted estaba separado de ella o estaban juntos?—¿No le digo que a los cuarenta días de salir de Tricoche me dió las primeras bofetadas; que fueron cuatro bofetadas?

"La pregunta es si cuando eso ocurrió usted estaba viviendo con ella.—No estaba viviendo con ella.

"¿Entonces usted fué a la casa de ella?—Fuí un día, pues me encontré con que estaba descalzo y fuí y le dije que me diera sesenta centavos para comprar unos *tennis*.

"¿Y usted dice que los dos salieron absueltos?—Sí, señor.— ¿Salió absuelta?—Sí, señor, 'saliría' absuelta por el amapucho que hubo.

.   .   .   .   .   .   .   .

"¿Y usted dice que vivía con un hermano?—Vivía con un hermano.—¿Y con quién vive ahora?—Vivo en el Callejón San Juan, porque estaba botado, y he encontrado una mujer a quien le he hecho favores, y ha dicho: 'este hombre no puede estar en la calle', y me llevó para su casa y se ha echado esta tarea al hombro. Sin embargo, esta mujer no se ha acordado de mí, de ayudarme ni de darme nada. Lo que quería era que me encontraran en la calle muerto, o que la policía me cogiera pidiendo y me llevara preso.

"¿La cuestión es que usted vive ahora con una querida?—Sí, señor.

"Ha vivido siempre con ella?—No, señor.

.   .   .   .   .   .   .   .

"Lic. Bahamonde: Usted diga la verdad. ¿Cuántos años hace que usted la conoce, que vive con ella?—Testigo: Le digo que vivía con ella y la dejé, y hará como seis meses que me fuí para su casa. En ese tiempo estaba en casa de Juan mi hermano."

¿Es justo que bajo esas circunstancias se dicte una sentencia ordenando a una esposa de edad avanzada que tiene por toda entrada para sostenerse alrededor de cuarenta dólares al mes que gana trabajando, que pase la mitad a un marido que vive con una mujer que fué su querida, relación ésta que originó constantes disgustos en el pasado, aunque se demuestre que la mujer maltrató de obra al marido, demostrán-

dose a la vez que la mujer en juicio repetidamente afirmó su disposición de ayudar al marido siempre que cesara la indicada relación? En manera alguna, a nuestro juicio.

Es cierto que la ley prescribe la obligación recíproca en que se encuentran ambos cónyuges de prestarse alimentos. Artículo 143 del Código Civil, ed. 1930. Y también lo es que esta corte interpretando y aplicando la disposición contenida en el artículo 148 del Código Civil acerca de que "el obligado a prestar alimentos podrá, a su elección, satisfacerlos, o pagando la pensión que se fije, o recibiendo y manteniendo en su propia casa al que tiene derecho a ellos", dijo en el caso de *Moll* v. *Llompart,* 17 D.P.R. 694, que "El derecho de opción que tiene el alimentista de acuerdo con el artículo 218 del Código Civil Revisado, no es un derecho absoluto e inflexible, y la oferta que haga el marido de atender a las necesidades de su esposa en su propia casa puede ser rehusada cuando razones de orden legal, moral, o social impidan su aceptación, o cuando exista causa razonable justificada para rechazar aquella oferta", regla que se ratificó en los casos de *Maeso* v. *Ortiz Sandoval,* 44 D.P.R. 162, 163 y *Padovani* v. *Irizarry,* 53 D.P.R. 627, pero la situación que aquí surge es distinta a las que ponían de manifiesto esos casos.

En *Girod* v. *Corte,* 43 D.P.R. 173 este propio tribunal dijo que para aplicar la ley en casos de esta naturaleza parecía razonable que se tuviera en cuenta "la realidad de la vida y los hechos que en ella ocurren", aplicando la doctrina de la sentencia del Tribunal Supremo de España de octubre 16, 1903, contenida en el primero de sus considerandos, como sigue: "Considerando que uno de los deberes más fundamentales impuestos por la ley a los cónyuges consiste en el de socorrerse mutuamente en todos los casos en que este socorro sea necesario, cualquiera que sea la situación legal del matrimonio, *a no ser que la necesidad del cónyuge sea proveniente*

*de. actos por él mismo realizados que le constituyan en una situación ilegal y contraria a derecho."* (Itálicas nuestras.) 96 Jurisprudencia Civil 375.

Aquí la realidad es que marido y mujer, no separados legalmente, lo estaban de hecho. Podría llegarse a sostener que la separación quizá se debió en un principio al maltrato del marido por parte de la mujer, pero la conducta del marido yendo a vivir con su querida impide que prospere su reclamación, habiendo manifestado como manifestó repetidamente la mujer en el juicio que está dispuesta a ayudar al marido pero no mientras viva con la querida. No vemos por qué el marido conduciéndose honestamente no pueda volver al lado de la mujer.

Admitimos que no es necesaria la separación legal de los cónyuges como condición previa a la reclamación de alimentos, pero para que la separación de hecho pueda servir de base a la reclamación, es necesario que de ella sea culpable aquél de los cónyuges contra quien se establezca la reclamación y que la conducta actual del reclamante la justifique.

*Debe revocarse la sentencia recurrida y dictarse otra declarando la demanda sin lugar, con las costas.*